Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (516) 236-3139
Fax: (212) 962-5037
Email: Jkaley@doarlaw.com

March 27, 2020

**BY ECF & EMAIL**
The Hon. Andrew L. Carter
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10607

**Re: United States v. James Wilson 18 Cr. 420 ((ALC)**

Dear Judge Carter:

I represent James Wilson in the above-referenced matter. I respectfully submit this letter in support of Mr. Wilson's within application for bail and an order granting his release from the MDC in Brooklyn and placement on home detention with electronic or GPS monitoring.

On February 28, 2020, Mr. Wilson pleaded guilty to a violation of 21 U.S.C. 841 (b)(1)(C) a lesser-included offense under Count One of the Indictment. Mr. Wilson currently is scheduled to be sentenced on May 19, 2020. Because I was on trial in a matter before Judge Joanna Seybert in the EDNY until March18, 2020 and now because of the outbreak of the Covid-19 virus, we have been unable to schedule Mr. Wilson's presentence interview and it appears unlikely that we will be

able to do so in the near future, notwithstanding my efforts to set up a telephone call with my client to discuss this with him.

On Wednesday, March 25, 2020, I received notice from the Federal Defender's Office that they had received notification from the MDC that Mr. Wilson is at "high risk" during the COVID-19 Outbreak. The reason for his designation as "high risk" was not identified in the information provided to the Federal Defender's Office but I assume it is because Mr. Wilson suffers from a respiratory ailment, i.e., asthma.

Mr. Wilson, as an incarcerated person with a respiratory affliction, is at "high risk" for contracting COVID-19, as noted by the MDC in designating Mr. Wilson as "high risk." As we all have come to learn in recent days, COVID-19 is a dangerous illness spreading rapidly across the world, country, and within New York State and New York City and recently identified as being within the MDC. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). While Mr. Wilson is not pretrial, the acute risk to Mr. Wilson given the conditions of incarceration, necessitates his release on bail until this pandemic has ended. Additionally, his release pursuant to § 3141 is necessitated based on the rapidly changing public health crisis that may imperil Mr. Wilson's physical health. *See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in a bail application). Mr. Wilson can live with his family in New York under home detention, electronic or GPS monitoring and any other conditions Your Honor deems appropriate.

## I.   The COVID-19 outbreak compels Mr. Wilson's release.

We are facing a serious and urgent public health crisis. On March 11, 2020, the World Health Organization officially classified COVID-

2

19, a new strain of coronavirus, as a global pandemic.[1] On January 21, 2020, Washington State announced the first confirmed case of coronavirus in the United States.[2] Only two months later, COVID-19 has infected over 60,000 people across the United States, leading to at least 428 deaths.[3]

The exponential rate of coronavirus infection is unparalleled. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. To date, the State has confirmed over 37,000 cases of the virus, with 385 deaths.  News reports are reporting that there have been 100 deaths in New York in the last 24 hours.  New York now has more confirmed cases of coronavirus than any other state in the country.

In response to this public health crisis, Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[4] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of over 500 people.[5] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain 6 feet of distance between each other.[6] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[7]

---

[1] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[2] *First Patient With Wuhan Coronavirus Is Identified in the U.S.*, The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[3] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Mar. 21, 2020), at https://nyti.ms/2U4kmud (updating regularly).

[4] *At Novel Coronavirus Briefing, Govermnor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[5] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, The New York Times (Mar. 12, 2020).

[6] *Novel Coronavirus (COVID-19),* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[7] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at

While adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, younger individuals are not immune from infection. Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[8] In New York, 18- to 49-year-olds comprise more than half of all cases in the State.[9] With thousands of confirmed cases in New York City and outer areas that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large. Because of his respiratory condition, Mr. Wilson is vulnerable and at "high risk."

### a. Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.

"Prisons are petri dishes for contagious respiratory illnesses."[10] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. Last week an inmate at the MDC tested positive for the coronavirus. As a result, the MDC is on lockdown and all legal and social visits have been terminated. The effect on the population at the MDC remains to be seen, but as the chief physician at Rikers Island cautioned, "A storm is coming."[11]

---

https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[8] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[9] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).

[10] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[11] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

Given what we know about COVID-19, a prison's quest to contain the infection seems futile. Coronavirus is highly contagious. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe." "Infection control is challenging in these settings."[12]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[13] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[14] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" reports that "COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[15]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[16] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[17] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[18] But the cases are not abating.

---

[12] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[13] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[14] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[15] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.

[16] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[17] *Id.*

[18] *Id.*

The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[19]

### b. The MDC is unprepared for a coronavirus outbreak.

Individuals at the MDC which houses pretrial detainees, inmates awaiting sentencing and sentenced inmates, or any prison or jail for that matter, is at serious risk of contracting the virus. On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, prohibiting visits to the MDC is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[20]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the CDC strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least 6 feet of space between people and social distancing.

To date, the MDC has not met even the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals, including James Wilson, live in tight quarters with many others. It is also unsanitary. There is no hand sanitizer and shared showers are cleaned only periodically.

---

[19] *Id.*

[20] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

With each additional arrest comes increased risk of spreading the virus in the MDC. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection. We have been advised that just last week a newly arrived inmate tested positive for the COVID-19 virus.

Notwithstanding a confirmed case of coronavirus at the MDC, the MDC remains unprepared for an outbreak. It is not likely that the facility currently has the ability to provide wider testing for coronavirus and we are unaware that there are appropriate general screening protocols in place among both new inmates and those who have been detained for some time. Given what we know about coronavirus, conditions of confinement inside prisons, and the lack of ability by the MDC, and prisons generally, to promote safety, inmates and staff are extremely concerned and scared.

### c. *The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.*

The judiciary has recently begun to recognize and address this exceptional crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center ("MDC") could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed herself "in light of circumstances that have changed since the March 6 hearing," namely,

"the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. *Id.* Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. *See United States v. Santiago Ramos*, 20-CR-04 (ER).

In the throes of this public health crisis, the Court should release Mr. Wilson on home detention to protect his physical health. This extraordinary health crisis requires judicial intervention to safeguard Mr. Wilson's health and his constitutional rights.

## II. The Bail Reform Act permits and in our respectful view, requires Mr. Wilson's release.

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary for preparation of the person's defense* or for *another compelling reason*." 18 U.S.C. § 3142(i). There is no more "compelling reason" than a person's physical health.

Indeed, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). *See also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

8

In *United States v. Rodriguez*, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" *Id.*; *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

That Mr. Wilson has pleaded guilty to charges of participating in a narcotics conspiracy to distribute and possession with intent to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and § 846 should not alter the outcome for this defendant. Pursuant to 18 U.S.C. §§ 3143 and 3145, we believe there is an "exceptional reason" why it is appropriate for Mr. Wilson to be released on home detention with electronic or GPS monitoring. Further, Mr. Wilson s not a danger to the community or a flight risk.

2. Release Pending Sentence Pursuant to 18 U.S.C. §§ 3143 and 3145

Generally, a defendant who has been convicted and is awaiting sentence must be detained unless the court finds by clear and convincing evidence that the defendant is unlikely to flee or pose a danger. 18 U.S.C. § 3143(a)(1). Where, however, the conviction involves an offense for which a maximum term of imprisonment of ten years or more is prescribed, such as in the Controlled Substance Act, section 3143 further provides that a defendant must be detained absent exceptional circumstances warranting bail,

> A person subject to detention pursuant to section
> 3143(a)(2) or (b)(2), and who meets the conditions of
> release set forth in section 3143(a)(1) or (b)(1), may be
> ordered released, under appropriate conditions, by the
> judicial officer, if it is clearly shown that there are
> exceptional reasons why such person's detention would
> not be appropriate. (emphasis added).

The Second Circuit has reasoned that 18 U.S.C. §3145(c) applies
equally to district and appellate courts. *See United States v. DiSomma*,
951 F.2d 494, 496 (2d Cir. 1991). The Court in *DiSomma* ruled that:

> While the language of section 3143(b)(2) compels detention,
> an exception permits release of mandatory detainees who
> meet the requirements for release under section 3143(b)(1),
> and "if it is clearly shown that there are exceptional reasons
> why such person's detention would not be appropriate." 18
> U.S.C. § 3145(c).

*Id*. at 496. § 3145(c) provides an exception to this requirement by
allowing a defendant to show by clear and convincing evidence that he
is not a danger to the community or a risk of flight, *see* § 3143(a)(1), and
that there exist "exceptional circumstances" demonstrating why the
defendant's detention would be inappropriate. *United States v. Lea*, 360
F.3d 401 (2d Cir. 2004). The test under § 3145(c) is necessarily a
flexible one, and district courts have wide latitude to determine whether
a particular set of circumstances qualifies as "exceptional." *DiSomma*,
951 F.2d at 497. The Second Circuit in *Lea* construed "exceptional
circumstances" to mean "a unique combination of circumstances giving
rise to a situation that is out of the ordinary," *Id*. at 403, and reinforces
the idea that the "test under §3145(c) is necessarily a flexible one with
wide latitude on the part of district judges to determine whether a
particular set of circumstances qualifies as 'exceptional.' *Lea*, 360 F.3d
at 403.

District courts, including those in this circuit, have found that a combination of unique facts, which includes personal factors, may be so exceptional as to warrant release. S*ee United States v. Lippold*, 175 F. Supp. 2d 537, 540 (SDNY 2001) (Sweet, J.) ([I]n combination with other factors, family circumstances may warrant release pending sentencing pursuant to §3145(c)." *See also United States v. Charger*, 918 F. Supp 301 (D.S.D. 1996) where the court found exceptional circumstances in a case involving violence where the defendant's act was based upon a substance abuse issue.  The court reasoned that the supportive role of the defendant's father, the stability of his father's residence and its location in a remote area, along with other facts, including participation in alcohol treatment, and removal of negative influences, provided the defendant with necessary guidance and counsel in order to effectively address the core issues that led to the criminal conduct were exceptional such that release pending sentencing was appropriate.

While the defendant here does not suffer from a substance abuse issue, his health and well-being is in jeopardy every day that he remains in the MDC.  His removal from the MDC is as necessary as alcohol treatment is for an alcoholic.   As such, "exceptional reasons" exist here based upon the facts identified in this letter.

Further, since his bail was revoked on August 20, 2019, the circumstances involving Mr. Wilson have changed dramatically warranting reinstatement of bail and release on home detention. Mr. Wilson urges that the Court find that he is neither a danger nor a flight risk and that he meets the "exceptional" circumstances requirement.

a.   Mr. Wilson's release to home detention is necessary

For the health reasons noted above reason, Mr. Wilson satisfies the "exceptional" circumstances requirement of the bail statute.

11

Continued incarceration at the MDC endangers his health as
reflected in the MDC's designation of Mr. Wilson as a "high
risk" inmate.

b. Mr. Wilson is Not a Danger to the Community or a Flight Risk

Mr. Wilson is not a danger to the safety of another person or the
community.  Mr Wilson was arrested on the indictment on June 20,
2018.  At that time the defendant consented to detention without
prejudice to a later application. (Dkt Entry # 31).  Thereafter, on June 25,
2018, bail was set for Mr. Wilson requiring, *inter alia*, a bond, co-
signed, and home detention with electronic monitoring.  The court
required that the conditions of bail be satisfied before release.  On June
25, 2018, Mr. Wilson satisfied the conditions of bail and was released.
)Dkt Entry # 82)..  In the months that followed, Mr. Wilson did well to
the point that on January 9, 2019 the conditions of Mr. Wilson's bail
were modified further to permit Mr. Wilson to discontinue home
confinement and in place of home  confinement the Court imposed a
curfew. (Dkt Entry #222).

Regrettably, however, by the summer of 2019 Mr. Wilson, who
has 2 children and who was living with his mother, had failed to abide
by all of the curfew requirements as scrupuously as he should have.  As
a result, his bail was revoked on August 20, 2019 and he was remanded.
(Dkt Entry #329).  The transcript of the detention hearing appears at Dkt
Entry #335.  A medical order was signed by the Magistrate Judge at that
time. (Dkt Entry #330).  Mr. Wilson remains in custody at the MDC.

Mr. Wilson now has been in custody for seven months since his
bail was revoked on August 20, 2019.  Mr. Wilson has learned a difficult
lesson and has suffered the consequences of his failure to strictly abide
by the curfew requirements of his bail conditions .  While incarcerated
he has had time to think and to reflect on his life and where he goes from
here.  He has accepted responsibility for his offense and has pleaded

guilty.  He is one of the least culpable of the defendants in the case.  In the plea agreement he received a four-level mitigating role adjustment. He is capable of living a productive law-abiding life and his health should not be put at further risk.

The full panoply of the circumstances present here, the danger to Mr. Wilson's health from further incarceration at this time, qualify as "exceptional" and we respectfully request that Your Honor allow Mr. Wilson to be released on his prior bail with the specific condition of home confinement with electronic or GPS monitoring.  This would allow Mr. Wilson to be removed from the present institutional risk to his health and would allow him to communicate with counsel, have a telephonic interview with Probation so that the PSI can move forward, with the hope that Mr. Wilson could be sentenced as scheduled.

## Conclusion

The Court cannot ignore the restriction of Mr. Wilson's constitutional right to counsel and the substantial threat incarceration poses to Mr. Wilson's physical well-being. As the Second Circuit recently opined in language instructive here, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

Accordingly, for all of the foregoing reasons, I respectfully request that the Court issue an order releasing James Wilson, reinstating his bail and imposing the special condition of home detention with electronic or GPS monitoring.

Thank you for your consideration of this matter.  I am available for a telephonic conference as the Court's schedule would allow and while I am working from home am available by email at Jkaley@doarlaw.com or on my mobile telephone at 516-236-3139.

Respectfully submitted,

_____/s/_____
John. F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
Office: 212-619-3730
Mobile: 516-236-3139
Email: Jkaley@doarlaw.com


Cc:   Assistant United States Attorney Jacob Warren (by email)